UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

JOSEPH CHRISTOPHE ISAAC
ROBITAILLE,

    Plaintiff,

v.

TRINITY HEALTH GRAND RAPIDS,

    Defendant.
_____/

Case No. 1:24-cv-1336

Hon. Hala Y. Jarbou

## OPINION

This is an employment discrimination and retaliation lawsuit brought by plaintiff Joseph Christophe Isaac Robitaille against defendant Trinity Health Grand Rapids under the Americans with Disabilities Act (ADA), 42 U.S.C. § 12101 *et seq.*, and Michigan common law.  Dr. Robitaille alleges that after he accused Trinity of endangering patient safety, the hospital suspended him and demanded that he submit to a psychiatric exam, then ended his employment when he refused to do so.  Before the Court are Trinity's motions for partial judgment on the pleadings (ECF No. 67) and for summary judgment (ECF No. 71).  For the reasons explained below, the Court will grant Trinity's motion for summary judgment, deny its motion for judgment on the pleadings as moot, and dismiss the case.

### I. BACKGROUND

Robitaille worked as an anesthesiologist for Trinity Health Grand Rapids beginning in August of 2022.  (Robitaille Decl. ¶¶ 2–3, ECF No. 79-1; Robitaille Dep. 66:3, ECF No. 79-2.) Robitaille had a positive relationship with Trinity and his supervisors for the first year and a half of his employment.  (*See* Robitaille Decl. ¶ 3.)  But things began to go downhill after an incident

on November 2, 2023.  That evening, Trinity's computer system experienced an unplanned outage that extended into the following day.  (Tocco-Bradley Dep. 12:18–13:25, ECF No. 79-3.)  System outages can make surgeries less safe for patients, and Robitaille became concerned that Trinity did not have proper policies for mitigating risks during outages.  (*See* Robitaille Decl. ¶¶ 5–6.)  Robitaille emailed his colleagues to suggest that during future outages the hospital should postpone elective procedures to ensure patient safety.  (11/24/2023 Email, ECF No. 79-10, PageID.2470–2471; 11/28/2023 Email, ECF No. 79-9, PageID.2466–2467.)

Shortly after, at a department-wide meeting on December 13, a colleague of Robitaille's gave a presentation about system outages.  (*See* Meeting Presentation, ECF No. 79-11.)  Robitaille expressed his concerns about the safety risks of conducting elective surgeries during outages.  (Giles Dep. 43:1–10, ECF No. 79-6.)  According to Juliane Giles, who led the meeting, Robitaille's safety concerns were "not the [intended] topic of the discussion at the meeting," and he raised his concerns "in a very disruptive manner."  (*Id.* at 31:24–25, 43:2-14.)  Dr. Brandon Francis, the Chief Medical Officer, testified that Robitaille was not "loud or aggressive" but did repeatedly interrupt Giles.  (Francis Dep. 32:10-15, 33:17-20, ECF No. 79-5.)  Francis found Robitaille's "interrupting, disruptive communication style" out of character for him, and told him that he was "raising appropriate safety concerns in an inappropriate, unprofessional manner and it has to stop." (Peer Review Hr'g 41:4-12, 41:20-22, ECF No. 72-7.)  Francis subsequently emailed some of his colleagues about Robitaille's behavior and filed a formal complaint with the human resources department. (12/13/2023 Email to Lundgren, ECF No. 79-12; HR Investigation Rep., ECF No. 79-14.)  After an investigation, the human resources department found that Robitaille's actions violated the hospital's Code of Conduct and warned him that future issues could "result in further corrective action, up to and including termination."  (12/22/2023 Letter, ECF No. 72-16.)

On December 19, 2023, the hospital's Practitioner Excellence Committee (the "PEC")—which implements the peer review process for evaluating the conduct of medical staff—held a meeting about "ongoing issues related to [Robitaille's] professionalism." (12/19/2023 Letter, ECF No. 72-17.)  The meeting addressed "concerns that ha[d] accumulated over the past months," and "concluded that this pattern of behavior is not in keeping with" policies governing staff conduct. (*Id.*)  The record does not clearly indicate what conduct the PEC was referring to, though its letter to Robitaille highlighted the need to "treat others with respect and courtesy."  (*Id.*)

According to Dr. Ashley Screws, the Medical Director of Anesthesia Services and Robitaille's then-supervisor (Peer Review Hr'g 184:1–3, 266:18–19), additional issues with Robitaille's conduct arose around this time.  Robitaille became more risk-averse regarding patient treatment, and would frequently seek advice from Screws about patients. (*See id.* at 214:11–14, 222:14–223:8.)  One day, Robitaille was assigned to a patient who had swallowed needles and needed emergency surgery. (*See id.* at 217:16–19.)  Robitaille refused to treat the patient because she did not have any transportation home after the surgery. (*Id.* at 217:21–23.)  Screws believed that the hospital could solve the transportation issue later, but Robitaille declined to administer treatment, and Screws had to step in to treat the patient. (*See id.* at 218:13–21.)  Screws testified that Robitaille's conduct created a "safety concern" because it delayed the surgery for several hours while Screws had to deal with the issue.  (*Id.* at 219:1–9.)  In general, Screws described Robitaille as acting more like a resident in training than a fully qualified doctor.  (*Id.* at 263:17–24.)

On January 23, 2024, the PEC sent Robitaille a letter about two patients he had recently treated, requesting that he provide a rationale for his treatment decisions.  (1/23/2024 Letter, ECF No. 72-19.)  Robitaille responded by email on February 6.  Regarding the first patient, Robitaille

3

provided little explanation for his decision other than several references to documents in the treatment record.  Regarding the second, Robitaille stated only that the PEC's letter "included assumptions regarding [Robtaille's] intentions rather than actions." (2/6/2024 Email, ECF No. 72-20.)  The PEC did not consider Robitaille's response "satisfactory" (Peer Review Hr'g 242:9–11), and followed up with an additional letter that requested a more detailed response as to the second patient and an explanation as to three other patients.  (2/7/2024 Letter, ECF No. 72-21.)  Robitaille asked for more time to respond to this letter, but the record does not reflect any response on his part.  (*See* 2/7/2024 Email, ECF No. 72-22, PageID.1543–1544; Peer Review Hr'g 580:18–581:9.)

On January 31, 2024, Stephanie Forzley—a clinical supervisor at the hospital—sent an email to Julie Rodibaugh—the Director of Surgical Services—indicating that there had been issues with Robitaille's treatment of three patients that day: Robitaille declined to treat one patient, letting Dr. Screws do so instead, and caused two other surgeries to be delayed.  (1/31/2024 Email, ECF No. 72-23; *see* Forzley Dep. 28:13–29:5, 32:15–22, ECF No. 72-24.)  Forzley noted that "these examples are not uncommon" and that "staff have mentioned several times how they do not feel comfortable working with Dr. Robitaille."  (1/31/2024 Email.)  Rodibaugh subsequently forwarded the email to Screws.  (*Id.*)  On February 2, 2024, Eric Prichard emailed Screws about a disagreement between Robitaille and another doctor regarding a surgery that took place that day.  (2/2/2024 Email, ECF No. 72-25.)  According to Prichard's email, the other doctor told him that Robitaille "came off as very paranoid and mentioned that they were being watched and recorded by the cameras and administration are 'breathing down [his] neck.'"  (*Id.*)[1]

---

[1] According to Francis, the operating rooms do have cameras, but they were not being used to watch Robitaille.  (Peer Review Hr'g 73:6–9.)

4

Screws testified that Robitaille was also becoming unable to complete his medical duties. As she explained, "[i]t went from [Robitaille] starting with the safety concerns to him not being able to really manage the complex patients to him refusing cases to then being so risk averse that . . . he couldn't manage more than one or two rooms," let alone the four he was expected to manage, "because he was just delving into every little bitty detail about the most basic stuff." (Peer Review Hr'g 235:8–22.) Screws "couldn't function [her]self as a medical director doing [her] own cases . . . because [she] was having to do so much for [Robitaille]." (*Id.* at 238:7–9.) She also heard from staff that Robitaille was "constantly talking about administration watching his clicks on the computer" and telling people that "[t]hey're watching us on the cameras." (*Id.* at 234:22–25.) One nurse told Screws that when Robitaille gave patients narcotics, he "put[] it up to the camera so [the administration] can see what he's giving"; the nurse described Robitaille as "sounding all kinds of crazy." (*Id.* at 238:21–239:3.) After hearing this, Screws met with Robitaille and observed that his demeanor was strange and "robot[ic]"; he "accus[ed] her of watching him" while he cared for patients, and said it "seem[ed] like the administration [was] watching [him]" too. (*Id.* at 255:4–256:4.)

On February 5, 2024, Screws sent Francis the following email:

> We have reached a point where Dr. Robitaille's paranoia is affecting his ability to see patients and function as a member of this team.
>
> I have had multiple conversations with [nurses] regarding his erratic/paranoid behavior. He has mentioned to them that we are "being watched on the cameras" and that "administration is breathing down his back". He is throwing [nurses] under the bus, and even hesitant to waste medications with them.[2]
>
> His fellow colleagues are noticing an increasing amount of paranoia and risk aversion. He is delegating his work to others to spend an unnecessary amount of time with other patients he may deem needs his attention. He is repeatedly mentioning his fears in the physician workroom to others. He is required to be able

---

[2] According to Screws, "wasting medication" refers to the disposing of controlled substances in a special receptacle, which is required by law. (Peer Review Hr'g 232:20–23.)

5

> to cover 4 rooms at a time, and quite frankly I feel he has a hard time covering two rooms, especially when a complex patient is involved.
>
> I specifically have had to take[ ]over management of several complex patients. He is not communicating with providers or coordinating care like his colleagues.
>
> This is becoming quite burdensome and we need some relief.

(2/5/2024 Email, ECF No. 72-26.) Francis testified that around this time, he had heard "concerns that [Robitaille] was having difficulty assessing a patient's level of risk," and "might try to minimize his [own] risk as opposed to the patient's risk" by "cancel[ing] the case, delay[ing] the case, get[ting] someone else to do the case." (Peer Review Hr'g 176:21–177:6.) Francis tried to talk to Robitaille about what might be going on in his life, but was unsuccessful; when he asked Robitaille how he was doing, Robitaille responded, "Are you a board-certified psychiatrist?" (*Id.* at 178:2–9.) This "left [Francis] with questions, doubts, concerns." (*Id.* at 178:9.) Screws similarly tried to talk to Robitaille to figure out if there was "something going on in [his] life," but "he would not engage with [her]." (*Id.* at 266:8–19.)

On February 9, 2024, Screws met with Robitaille and suggested she was concerned about his mental health. (Robitaille Decl. ¶ 8.) Several days later, Robitaille sent a follow-up email to Screws in which he assured her that he was "doing well clinically" and satisfied with his work and personal life. (2/26/2024 Email, ECF No. 79-17.) On the same day, February 15, Screws sent Robitaille an email to inform him she was suspending his clinical privileges. (Robitaille Decl. ¶ 9.) Screws and Dr. Shannon Armstrong, the Chief of Medical Staff, met with Robitaille on February 26 to discuss his suspension. (Screws Dep. 76:21–25, ECF No. 79-1.) At the meeting, Armstrong told Robitaille that the suspension was "[t]o evaluate safety for patients" and "[t]o determine that there is nothing behavioral to discuss," though she did not provide specifics. (Robitaille Notes, ECF No. 72-27, PageID.1565.)

6

The hospital's Medical Executive Committee (the "MEC") met on March 6 to address the suspension.  (3/6/2024 MEC Meeting Minutes, ECF No. 72-29.)  Before the meeting, Screws sent a report to MEC members summarizing the issues with Robitaille.  (Peer Review Hr'g 250:8-19.)  These included the fact that he was "[e]xtremely [r]isk [a]verse" and had "shift[ed] from doing what's best for the patient, to how he can protect himself from legal liability"; his "[i]nability to coordinate care for complex patients," requiring "guidance" from Screws; his "increasingly heightened supervision of less complex patients resulting in extreme inefficiency," which sometimes would force other doctors to take on his cases; his "[d]isruptive behavior at [the] staff meeting"; and his "paranoia," evidenced by "[r]efus[ing] to waste meds," "telling [nurses] he is being watched and followed and that [the] administration is 'out to get him,'" "[t]elling fellow [doctors] that their 'clicks' on [the computer system] are being monitored," "[h]olding medications up to fictitious 'cameras' so he is not accused of diversion [of controlled substances]," "instructing [nurses] . . . to do the same after demonstrating this process," creating "[e]xcessive documentation in chart for routine things," and conducting "excessive check ins/sign ins for healthy stable patients undergoing simple procedures."  (Screws Rep., ECF No. 72-18, PageID.1531–1533; *see also* Peer Review Hr'g 250:25–257:5.)

On March 6, 2024, Francis sent Robitaille a letter stating that the MEC had "upheld and continued the summary suspension at its meeting."  (3/6/2024 Letter, ECF No. 79-14, PageID.2496.)  Francis indicated that the suspension was based on "continuing concerns the MEC has for [Robitaille's] behavior's effects on the effective operation of the Hospital and on the environment necessary for the provision of safe and quality patient care."  (*Id.*)  Furthermore, before the MEC would reconsider the suspension, it required Robitaille to complete a drug test

7

and a "[f]orensic psychiatric evaluation completed by a psychiatrist chosen from a list provided by the MEC." (*Id.*)

Robitaille agreed to take a drug test, which was negative. (Peer Review Hr'g 78:23–79:2.) However, he refused to undergo a psychiatric evaluation because he "knew that [he] would have no access to the information that would be provided to the examiners and that false information was likely to be provided to the examiners." (Robitaille Decl. ¶ 12.) He "expected Trinity to use the report as a pretext to support their decision to suspend [his] hospital privileges." (*Id.*) Robitaille remained suspended through August 2024, when his clinical privileges at the hospital were set to expire. (Francis Decl. ¶ 24, ECF No. 72-6.) He applied to renew his privileges, but the MEC recommended denial of his application on August 21, 2024. (*Id.* ¶¶ 25–26; 8/12/2024 MEC Meeting Minutes, ECF No. 72-33, PageID.1739.) According to Francis, the MEC "needed to have a forensic psychiatric evaluation to be able to assess [Robitaille's] ability to function as an anesthesiologist." (Peer Review Hr'g 90:21–21.)

Robitaille challenged his suspension and denial of reappointment through the hospital's peer review process. (*Id.* at 90:1–5.) After a hearing, the peer review committee issued a report on July 30, 2025, recommending that Robitaille not be reinstated because he "exhibit[ed] a range of disruptive, unprofessional and seemingly paranoid behavior that . . . was detrimental to fostering an environment of safe, effective, efficient and quality patient care." (Committee Rep. 13, ECF No. 72-30.) The MEC subsequently affirmed this recommendation. (9/10/2025 Letter, ECF No. 72-34.) Robitaille appealed to the Board Review Panel, and those proceedings remain pending. (Scheduling Notice, ECF No. 72-35.) Robitaille's employment with Trinity formally ended on August 7, 2025. (8/4/2025 Letter, ECF No. 72-39.)

## II. STANDARD

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The party moving for summary judgment bears the burden of demonstrating that there is no genuine dispute of material facts. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). A fact is material if it "might affect the outcome of the suit." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A material fact is genuinely disputed when there is "sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party." *Id.* at 249 (citing *First Nat'l Bank of Ariz. v. City Serv. Co.*, 391 U.S. 253, 288–89 (1961)). The Court "must shy away from weighing the evidence and instead view all the facts in the light most favorable to the nonmoving party and draw all justifiable inferences in their favor." *Wyatt v. Nissan N. Am., Inc.*, 999 F.3d 400, 410 (6th Cir. 2021).

## III. ANALYSIS

### A. ADA Medical Examination Claim

The ADA provides that an employer "shall not require a medical examination . . . unless such examination . . . is shown to be job-related and consistent with business necessity." 42 U.S.C. § 12112(d)(4)(A). "The employer bears the burden of proving that a medical examination is job-related and consistent with business necessity by demonstrating that: '(1) the employee requests an accommodation; (2) the employee's ability to perform the essential functions of the job is impaired; or (3) the employee poses a direct threat to himself or others.'" *Kroll v. White Lake Ambulance Auth.*, 763 F.3d 619, 623 (6th Cir. 2014) (quoting *Denman v. Davey Tree Expert Co.*, 266 F. App'x 377, 379 (6th Cir. 2007)). "The business-necessity standard cannot be satisfied by an employer's bare assertion that a medical examination was merely convenient or expedient." *Id.* "Rather, the individual who decides to require a medical examination must have a reasonable

9

belief based on objective evidence that the employee's behavior threatens a vital function of the business." *Id.*

Trinity argues that there was ample evidence suggesting Robitaille was acting paranoid, not performing his medical duties, and potentially endangering patients. As noted above, the MEC was told that Robitaille was becoming overly risk-averse, treating fewer patients than expected, delaying surgeries or refusing to participate, and constantly talking about being watched. Nowhere in Robitaille's response does he dispute that he engaged in this behavior. Given those facts, no reasonable jury could find that Trinity lacked an objective basis for requiring Robitaille to undergo drug testing and a psychiatric evaluation. An anesthesiologist who acts unpredictably can endanger patients' lives. Screws testified that her inability to "predict what Dr. Robitaille would do in any situation" was "scary," and allowing Robitaille to keep working would be "putting patients in harm's way." (Peer Review Hearing 240:19–241:10.) Similarly, Francis testified that "a lot of things can happen if an anesthesiologist makes a poor decision on a patient during a procedure," including "brain damage" or "death." (*Id.* at 53:23–25.) It was thus reasonable for the MEC to be concerned about Robitaille's unexplained behavior, and to try to determine via medical examination if the behavior was the result of drug use or mental illness. *See Sullivan v. River Valley Sch. Dist.*, 197 F.3d 804, 812 (6th Cir. 1999) (finding psychological exam reasonable when plaintiff's "behavior had given the [defendant] reason to seek further information about his fitness for continued employment").

Robitaille contends that the medical exam was unreasonable, but his arguments are unpersuasive. First, he argues that "no one within Trinity observed Robitaille under the influence of drugs or suspected that Robitaille was using drugs." (Pl.'s Resp. 27, ECF No. 79.) Be that as it may, it was reasonable for the MEC to suspect that something was amiss with Robitaille, and to

10

infer that drug use could be a potential cause.  Second, Robitaille argues that "no one observed Robitaille acting in a way that suggested that he need psychiatric help or was suffering from a mental illness." (*Id.*)  To the contrary, the evidence detailed above provides reason to think Robitaille may have needed psychiatric help.  Third, Robitaille asserts that "[t]he only reasons given for Trinity's demand that Robitaille take a drug test and submit to a psychiatric exam[] was his alleged 'unprofessional communication during the [staff] meeting.'"  (*Id.* at 28 (citing 12/13/2023 Email to Robitaille, ECF No. 79-13, PageID.2488).)  But the MEC based its decision on a pattern of concerning behavior by Robitaille; his conduct at the meeting was not the sole or primary cause of the medical exam requirement.

Robitaille also argues that there is a dispute of fact as to how often he sought assistance from Screws, and points to the statement in his declaration that he "spoke to [Screws] regarding clinical issues only due to the tasks she was responsible for as medical director." (Robitaille Decl. ¶ 8.)  It is not clear that this statement is actually a denial that Robitaille frequently asked Screws for guidance.  But even if it is interpreted that way, Robitaille's habit of excessively relying on Screws was only one of the many concerning behaviors the MEC was told about.  Moreover, the relevant question is whether the MEC had a "reasonable belief" that a medical exam was warranted, *Kroll*, 763 F.3d at 623, and the underlying truth of Screws' claim does not impact whether the MEC was reasonable in relying on it.  Robitaille does not dispute that Screws told the MEC he frequently sought guidance from her, or provide any reason why the MEC should have doubted Screws' claim, so he cannot challenge the reasonableness of the MEC's decision.

Additionally, Robitaille takes issue with Trinity's reliance on testimony from the hospital's peer review hearing, asserting that the testimony is inadmissible under Michigan's peer review privilege, *see* Mich. Comp. Laws § 333.20175(13). (Pl.'s Resp. 29.)  Remarkably, this is the exact

11

opposite of the argument that Robitaille made in a previous brief, where he asserted that Michigan's peer review privilege is inapplicable because this case is brought under the Court's federal question jurisdiction. (Pl.'s Br. in Opp'n to Mot. to Seal 6, ECF No. 20.) And Robitaille was correct the first time: "in federal question cases where pendent state claims are raised[,] the federal common law of privileges should govern all claims of privilege raised in the litigation." *Hancock v. Dodson*, 958 F.2d 1367, 1373 (6th Cir. 1992) (quoting *Perrignon v. Bergen Brunswig Corp.*, 77 F.R.D. 455 (N.D. Cal. 1978)). Moreover, Robitaille does not argue that a federal peer review privilege exists; indeed, he contended in his prior brief that "there is no federal law peer review privilege in cases such as this one." (Pl.'s Br. in Opp'n to Mot. to Seal 6); *see also Est. of McCleary v. QCHC of Tenn., PLLC*, No. 3:23-CV-385-CLC-DCP, 2025 WL 296142, at *3 (E.D. Tenn. Jan. 24, 2025) ("The weight of authority in the Sixth Circuit and elsewhere is that no medical peer review privilege exists under federal common law."). Thus, Trinity may rely on the peer review hearing testimony.

Finally, Robitaille argues that the MEC's proffered explanation for its disciplinary action is mere pretext, and that the MEC actually intended to retaliate against him for raising safety issues about the system outage policies. But this argument also misses the mark. The test for whether a medical exam was warranted is an objective one. *Kroll*, 763 F.3d at 623. "[T]he individual who decides to require a medical examination must have a reasonable belief based on objective evidence that the employee's behavior threatens a vital function of the business." *Id.* Although a business-related concern must be present, an employer need not be *motivated* by that concern: to the contrary, "there is no need to assess an employer's intent in ordering a fitness-for-duty examination." *Sullivan*, 197 F.3d at 813. "An employee's protection from harmful intent on an employer's part comes from the dual requirements that there be evidence sufficient for a reasonable

12

person to doubt whether an employee is capable of performing the job, and that any examination be limited to determining an employee's ability to perform essential job functions." *Id.* In other words, as long as the employer shows it had a reasonable basis to order an exam, the Court will not inquire into its actual motivations for doing so. Here, because Trinity had an objectively sound basis for ordering an exam, it is entitled to summary judgment.

### B. ADA Retaliation Claim

The ADA also provides that "[n]o person shall discriminate against any individual because such individual has opposed any act or practice made unlawful by this chapter." 42 U.S.C. § 12203(a). Robitaille argues that Trinity violated this provision by ending his employment because he opposed its demand for a medical exam. However, Robitaille admits that "[a] retaliation claim cannot stand where an employee refuses a proper request for a medical exam." (Pl.'s Resp. 31 (emphasis removed) (quoting *Sloan v. Repacorp, Inc.*, 310 F. Supp. 3d 891, 901 (S.D. Ohio 2018)).) That statement is not strictly true; Robitaille could bring a retaliation claim if he "ha[d] a reasonable and good faith belief that the opposed act or practice is unlawful under the ADA." *Barrett v. Lucent Techs., Inc.*, 36 F. App'x 835, 840 (6th Cir. 2002). But here, there is no evidence that Trinity acted unlawfully in ordering the medical exam, or that Robitaille had a reasonable belief that Trinity acted unlawfully in doing so. Accordingly, Trinity is entitled to summary judgment on Robitaille's ADA retaliation claim.

### C. Discharge in Violation of Public Policy

Robitaille also brings a claim under Michigan common law for discharge in violation of public policy. *See Suchodolski v Mich. Consol. Gas Co.*, 316 N.W.2d 710, 711–12 (Mich. 1982). However, because the Court has dismissed the federal claims that formed the basis of its jurisdiction over this case, it will decline to exercise supplemental jurisdiction over this state law claim. *See* 28 U.S.C. § 1367(c)(3) (allowing dismissal of supplemental claims when "the district

13

court has dismissed all claims over which it has original jurisdiction"). Although "there is no categorical rule that the pretrial dismissal of a federal claim bars a court from deciding remaining state law claims," it is generally true that "[w]hen all federal claims are dismissed before trial, the balance of considerations usually will point to dismissing the state law claims." *Musson Theatrical, Inc. v. Fed. Exp. Corp.*, 89 F.3d 1244, 1254 (6th Cir. 1996), *amended on denial of reh'g*, No. 95-5120, 1998 WL 117980 (6th Cir. Jan. 15, 1998). Furthermore, evaluating Robitaille's claim would require the Court to opine on unsettled issues of Michigan common law; thus, "retaining jurisdiction would undermine federal-state comity because . . . the state claim[] raise[s] difficult state-law questions." *Cotterman v. City of Cincinnati*, No. 21-3659, 2023 WL 7132017, at *6 (6th Cir. Oct. 30, 2023). Accordingly, the Court will dismiss the state law claim.

## IV. CONCLUSION

For the reasons explained above, the Court finds that Trinity is entitled to summary judgment on Robitaille's ADA claims; it will also decline to exercise supplemental jurisdiction over his state law claim.[3] Because the Court will grant summary judgment to Trinity, it will deny Trinity's motion for judgment on the pleadings as moot.

An order and judgment will issue in accordance with this Opinion.

Dated: December 17, 2025                /s/ Hala Y. Jarbou
                                                           HALA Y. JARBOU
                                                           CHIEF UNITED STATES DISTRICT JUDGE

---

[3] Because the Court finds that Trinity's decision to require a medical exam was objectively reasonable, it does not address Trinity's other arguments in favor of dismissal, including that Trinity is not liable for the MEC's actions and that Robitaille's claims are barred by the hospital bylaws.